**CALVERT et al. v. A–1 BIT & TOOL CO.**

**No. 10104.**

Court of Civil Appeals of Texas.
Austin.

Feb. 25, 1953.

Rehearing Denied April 15, 1953.

Price Daniel, Atty. Gen., W. V. Geppert, Asst. Atty. Gen., and by P. Frank Lake, Asst. Atty. Gen., for appellants.

R. M. Thornton, Jr., Houston, and Hornsby & Kirk, Stanley Hornsby, Austin, for appellee.

HUGHES, Justice.

A-1 Bit and Tool Company, a corporation, appellee, sued Robert S. Calvert, Comptroller of Public Accounts of Texas and his deputy, William B. Davis, for a declaratory judgment concerning the extent of its liability, if any, for taxes under the provisions of Article 7060a, Vernon's Texas Annotated Civil Statutes.

This statute provides that every person, including a corporation, who is

"* * * in this State engaged in the business of furnishing any service or performing any duty for others for a consideration or compensation, with the use of any devices, tools, instruments or equipment, electrical, mechanical, or otherwise, or by means of any chemical, electrical or mechanical process when such service is performed in connection with the cementing of the casing seat of any oil or gas well or the shooting or acidizing the formation of such wells or the surveying or testing of the sands or other formations of the earth in any such oil or gas wells, shall report on the 20th day of each month and pay to the Comptroller, at his office in Austin, Texas, an occupation tax equal to 2.42% of the gross amount received from said service furnished or duty performed, during the calendar month next preceding. * * *"

Appellee alleged that it:

"* * * is engaged in the manufacturing, selling, renting and servicing tools used in the drilling of wells. That among the tools manufactured, sold, rented and serviced by plaintiff is a tool commonly called a wire line core barrel. This tool has been in use for many years and is widely used and accepted throughout the drilling industry. That in December of 1945 plaintiff perfected the design of a wire line core barrel, which instead of cutting the core vertically as had been the practice, cuts the core at an angle of approximately twenty degrees with the well bore. That the new or side wall type barrel is rented to the industry

based on the number of cores and the depths at which they are taken. To insure the proper assembly and operation by the drilling crew and to record the cores taken, a serviceman is sent out with each barrel, a charge for this serviceman's time and the mileage to and from the location is charged to the customer separately from the rental on the tool and the bits or core heads used."

Appellee further alleged that just prior to May 14, 1951, representatives of the Comptroller advised that it was considered an "oil and gas well service company" within art. 7060a, supra, and taxable thereunder as to certain portions of its business. The books of the company were then audited by the Comptroller as to all side wall oil well coring done since December, 1945. This audit resulted in a demand upon appellee by the Comptroller for taxes and penalties under the above statute in the sum of $18,849.88.

Denying that it was an "oil and gas well service company" within the meaning of such statute appellee alleged that it was

"* * * predominately engaged in manufacturing, selling and renting of mechanical tools, and that their servicemen are engaged in a mechanical pursuit and as such are exempt from this tax under Article VIII, Section 1, of the Constitution of Texas."

Alternatively appellee pleaded that if taxable at all it was taxable only on the amount charged the customer for time of the serviceman who accompanied the coring tool to the wells.

The answer of appellants was to the effect that appellee was within the statute and that the tax should be computed upon the gross receipts from the coring operations.

The judgment of the trial court sustained appellee's amenability to the statute but upheld its alternative position, decreeing that taxes should be computed only upon the charges made for time of the serviceman.

Our view is that this construction of the statute is too narrow.

This is a revenue statute enacted to aid in the support of the State government and is to be liberally construed to achieve this purpose. Federal Crude Oil Company v. Yount-Lee Oil Company, 122 Tex. 21, 52 S.W.2d 56.

The evidence shows that appellee manufactures the side wall coring tool used in the operations involved in this suit. This patented tool is the result of intensive engineering research. It is designed to secure the advantages of drilling the oil or gas well and then coring at selected depths.

We quote from appellee's brochure regarding this tool:

"This Side Wall Core Barrel is designed to cut cores in hard as well as soft formation. It operates similar to regular Wire Line Barrels except that the cores are cut at an angle of approximately twenty degrees with the well bore. It is fed into the wall of the well bore by means of pump pressure. Rotation is transmitted to the core Cutter Head by the drill pipe resulting in true cores that are not mashed, distorted, or contaminated. Such cores are ideal for Laboratory examination and evaluation. They are 1¼" O.D. and have sufficient volume to allow complete analysis for permeability-vertical and horizontal—porosity, oil and water content, chloride content, and grain size.

"This tool is operated by and with regular Rotary drilling equipment plus an auxiliary Sand Line Hoist. Cores are cut with mud circulating as in regular drilling. Cores are cut quickly and are completely enclosed in an Inner Barrel. Since the cores are cut after the well is drilled and after running the electrical log, non-essential zones or sections are not cored. This results in reduced coring costs and less coring time."

"Comments and Recommendations

"The information contained herein is passed on to you in order to help promote more efficient operation of this revolutionary Tool. As you use it, you will learn other things about the tool which will assist you in increasing operating efficiency.

"Due to the nature of this Tool and the fact that the Core Barrel, including the core Cutter Head must pass through the drill pipe, it is obvious that the Barrel itself is inherently fragile as compared to the strength of the drill pipe. In view of this fact, it must be operated carefully. Close attention should be paid to operating pressures, drill pipe torque and wear of parts.

"We recommend that you read all of the information contained herein carefully so that you may be fully advised as to the limits of the tool. Note particularly the way in which the Core Barrel is assembled. After you are completely familiar with the structure of the tool, carefully study the Coring Procedure. As noted above, the operation of the drilling rig while the tool is in the hole must be carefully supervised. Excess pump pressure should be avoided while coring, and in case torque on the drill pipe increases, the operation should be shut-down and the Core Barrel removed."

Several pages of detailed instructions regarding coring procedure are contained in the brochure.

The tool weighs about 7,000 pounds and is worth about $7,000.

Appellee sells the tool abroad but not in the United States. The use of the tool in Texas is under the following typical circumstances:

The Company at the request of the driller of the well transports and delivers, in its own trucks, the tool and bits to the well location. A company serviceman who is familiar with the operation of the tool accompanies the tool and instructs the driller and his crew in the method and manner of properly operating the tool and keeps a record of the number of and depth at which the cores are taken.

When the driller is ready to take a core he attaches or screws the outer housing to the drill pipe and lowers it into the hole until it reaches the proper depth. The core

barrel assembly is then lowered into the drill pipe and pumped down the well; it is guided through the housing and deflected to the side wall of the well bore; rotation is then begun, and the core barrel moves or cuts into the formation. After the coring is completed, a retrieving tool is lowered into the well and the barrel is pulled out of the hole. The core, if the job is successful, is then removed from the core barrel. The depth at which the cores are taken and the number of cores to be taken are determined by the driller. The driller remains in control of the drilling rig throughout the coring operation. The company does not examine or analyze the cores or furnish any sort of geological data or information to the driller of the well.

The order contract used by appellee is in the following form:

FORM NO. 25

### SERVICE CONTRACT—SIDEWALL CORE BARREL

## A-1 BIT & TOOL COMPANY          SW N? 805
P. O. BOX 2132          2000 HUSSION STREET
HOUSTON, TEXAS

YOUR ORDER NO. _____          DATE _____ 19 ___

CHARGE TO _____

ADDRESS _____

INVOICE MAILING ADDRESS _____

FIELD          COUNTY          STATE          LEASE & WELL

### DESCRIPTION OF SERVICE IN DETAIL

NOTE: MINIMUM CHARGE FOR 5 CORES WILL BE MADE BASED ON STARTING DEPTH OR DEEPEST DEPTH.

| CORE NO. | DEPTH | CORE RECOVERY | DESCRIPTION OR REMARKS | GEOLOGICAL NOMENCLATURE | | |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | | | | | |
| 18 | | | | | | |
| 19 | | | | | | |
| 20 | | | | | | |

CUTTER HEADS:          TYPE          @ $          PER HEAD
                       TYPE          @ $          PER HEAD

SERVICE HOURS:    A. M. P. M.    TO    A. M. P. M.
                  HOUR    DATE    HOUR    DATE
                       TOTAL HOURS          @          PER HOUR

TRUCKING CHARGES: FROM          TO LOCATION          MILES 7000 LBS. @          CWT

FROM LOCATION TO          MILES 7000 LBS. @          CWT

TOTAL

OPERATOR          CUSTOMER'S SIGNATURE

A sample invoice, selected at random, reads:

"All invoices payable
at Houston, Texas

Telephone
Charter 7611

Invoice
A-1 Bit & Tool Company, Inc.
P. O. Box 2133
Houston, Texas

Manufacturers of Oil Field Tools

"Gulf Oil Corporation
Route 3, Box 500
Houston, Texas

Date    April 13, 1951.
Our No.    1.160
Your No.    33166
Terms    Net Cash

| | |
|---|---:|
| Sidewall Coring your Jennie Settegast 3A, Pierce Junction Field, Harris County, Texas 5 Cores between 7060' and 7059' —Minimum Charge | $  500.00 |
| 1 Core at 7058'—6th Core | 76.00 |
| 1 Core at 7057'—7th Core | 74.00 |
| 1 Core at 7056'—8th Core | 72.00 |
| 1 Core at 7055'—9th Core | 70.00 |
| 1 Core at 7053'—10th Core | 68.00 |
| 1 Core at 7061'—11th Core | 66.00 |
| 1 Core at 7091'—12th Core | 64.00 |
| 1 Core at 6833½'—13th Core | 55.00 |
| 1 Core at 6832½'—14th Core | 53.00 |
| 1 Core at 6831½'—15th Core | 51.00 |
| 3 Core Cutter Heads @ 20.00 per Head | 60.00 |
| Service Hours: 68 Hours @ 2.50 per Hour | 170.00 |
| Trucking Charges: | |
| Houston to Location 6 Miles 7000 No. @ .22 Cwt. | 15.40 |
| Location to Houston 6 Miles 7000 No. @ .22 Cwt. | 15.40 |
| | $1,409.80. |

Our Ticket No. 139
"

Appellee's first cross point is that the trial court erred in not holding, from the undisputed evidence, that, as to its activities involved here, it was engaged in a mechanical pursuit and exempt from the occupation tax levied by art. 7060a, under the provisions of Section 1, art. VIII, of the Texas Constitution, Vernon's Ann.St., declaring that persons engaged in mechanical pursuits shall never be required to pay an occupation tax.

The rule for determining whether a person is engaged in a mechanical pursuit was stated by this Court in Western Company v. Sheppard, 181 S.W.2d 850, 854 (writ ref.), as follows:

"The test as stated by the foregoing definitions and authorities is whether or not the intellectual quality predominates over manual skill in performing the duties of the particular calling. If the mental aspect is controlling, then the pursuit is classified as a profession. If skill in the manipulation of the hands, tools, and machinery is emphasized over the mental side, then the calling is classified as a mechanical pursuit."

Attempting to qualify under this rule appellee's Vice President in charge of Engineering and Manufacturing testified in substance:

The only educational requirements for the serviceman employed by appellee was that such person be able to read and write. Appellee preferred to hire either "rough-

necks" or drillers. After such person had actually been on the job with another serviceman for three jobs and had been trained to get the proper information for billing, he became a serviceman ready to go out on the job. The side wall core barrel was not a technical piece of equipment. The instructions for its use are very simple. The serviceman merely tells the drilling crew "to screw this piece into this piece" and then tells them to screw the unit onto the bottom of the drill pipe. The serviceman tells the driller to circulate at a certain pressure and that the pressure gauge would change "and that is all he tells them." The main thing appellee desires in a serviceman is a good honest man that will actually get a record of the cores so that the customer can be billed properly. The actual coring operation is a simple one and instances have occurred where the serviceman didn't show up to instruct the drilling crew at all yet they did a complete job. Appellee has never had a man fail to "make the grade" on account of his ability to learn.

The trial court expressly denied the contention of appellee that it was engaged in a mechanical pursuit and we must therefore conclude that the lower court was more impressed by the language used by appellee in its brochure where the motive was to insure efficient and satisfactory operation of the tool than the testimony of its Vice President at a time when the motive was to avoid the imposition of taxes.

■ We believe the evidence more than sufficient to sustain an implied finding of the trial court that mental knowledge rather than manual skill predominated in the performance of services which appellee was employed to render.

Appellee's second cross point is that, as a matter of law, its operations are not in connection with the surveying or testing of the sands or other formations of the earth in oil and gas wells and hence such operations, in their entirety, are not taxable under art. 7060a, supra.

Its argument under this point is summed up thusly:

"Appellee in the operation herein involved merely sticks its core barrel into the earth and brings out a material. It does not either survey nor test the sands or other formations of the earth. As appellee is neither surveying nor testing the sands or other formations of the earth its operation does not come within the scope of Article 7060a."

The fallacy of appellee's position is that the statute does not require that it survey or test the sands or other earth formations in order to be taxable but only that it perform a duty or furnish a service "in connection with" the surveying or testing of the sands or formations of the earth in any oil or gas wells.

■ Since appellee performs a service in connection with surveying or testing the sands or other formations of the earth in an oil or gas well it falls within the statute.

This brings us to a consideration of appellants' single point and appellee's reply point by which appellee contends that the only taxable portion of its business under this statute is the charge made for the serviceman who accompanies the tool to the well, whereas appellants contend that all charges made for the service rendered form the basis of the tax.

Appellee construes the Western case, supra, as being decisive in its behalf.

In that case Western was engaged in the business of acidizing oil wells, the acidizing process requiring the use of large quantities of acid and Western was "more interested in the sale of the acid than in placing it in the well." The Court there further said:

"There are thus involved in the business of such appellants two factors,— one a sale of the acid; and the other a service of placing same in the well in such manner, by the use of their own equipment, skill, etc., as to accomplish the desired result. The major portion of the gross receipts for the overall undertaking was for the materials furnished and used; and the charge for 'servicing' the well with such materials constituted only a minor portion of

the total aggregate or gross charge, though the two items were not specifically segregated in such overall or gross charge."

■ The court concluded that the cost of the acid should not be included in the gross receipts subject to the tax. This decision not only is the law but in our opinion it is good law. It emphasizes the rule that all statutes should be reasonably, fairly and sensibly construed. 39 Tex.Jur. p. 172.

The law is the same here as it was in Western but the facts are different.

■ Appellee in its domestic business does not sell any commodity or product. It is true that core cutter heads are worn out in the coring process but appellee is not engaged in the business of selling core cutter heads any more than a barber in shaving a person is engaged in the business of selling soap. The consumption of soap is incidental to the barber business just as the loss of these heads is incidental to the coring business. In the sample bill, copied above, the cost of core cutter heads amounted to but .042% of the total charges.

It should also be remembered that these core cutter heads have no sale market because they are attachments for a patented tool which cannot be purchased.

The bulk of the charges making up the sample bill is for cores taken. These charges, appellee contends, are for rent of the coring tool and not for service rendered. The record does not bear out this theory.

We have been unable to find the word "rent," "lease," "use," "hire," or any similar word in any of the documents used in the transactions between appellee and its customers, nor in such documents have we found any group of words indicating an agreement in the nature of a rental contract.

On the contrary, we have found the agreement described by appellee to be a "Service Contract—A–1—Sidewall Core Barrel" and spaces provided in the contract for a "description of service in detail."

These terms are very unbecoming to a rental contract.

It is also interesting to note that the compensation in this respect is not based upon the length of time during which the tool is used, the usual method employed in rental agreements, but upon the number and location of the cores taken.

Then, too, appellee sends along with the tool a "serviceman" who directs use of the tool.

The importance of his functions are belittled by appellee's Vice President in charge of Engineering and Manufacturing but his wage scale of $2.50 per hour indicates that his duties and responsibilities are above the common labor level.

The presence of this serviceman on and during missions requiring use of this coring tool and his supervisory control is strong proof that appellee at no time surrenders legal possession of the tool to any of its customers.

We believe appellee correctly labeled its activities as a "service contract" and that the trial court was in error in holding that the coring tool was merely rented. It might as well be said that a ginner leases his gin to each farmer whose cotton he gins, or that a compressor leases his compress each time he compresses a bale of cotton, or a hay baler leases his baler to each farmer whose hay he bales or that a doctor leases his X-ray to each patient whose body he X-rays.

"The word 'service' signifies much more than merely the act of performing labor." [1] Included within its meaning here and as used by appellee in its printed forms are all the benefits conferred by appellee upon its customers by the use of the coring tool. All charges necessarily incurred in and incidental to the bestowal of these benefits and which the customer is required to pay are properly allocated to the gross receipts of appellee for furnishing the service described in the statute. This includes mileage of the tool to and from the well location.

The sample bill shows a gross charge of

1. A. Kron Livery & Undertaking Co. v. Weaver, Mo.App., 280 S.W. 54.

$1,409.80 to Gulf Oil Corporation for "Side-wall Coring your Jennie Settegast 3A, Pierce Junction Field, Harris County, Texas" of which amount the trial court has held but $170 (12%) to be taxable. Such construction of a gross receipts tax statute upon the amount received for the service described is, in our opinion, neither liberal, reasonable nor sensible.

We, in accordance with the views expressed herein, affirm the trial court's judgment in part and reverse and render judgment in part.

Affirmed in part and reversed and rendered in part.

### On Motion for Rehearing.

Appellee complains of our factual interpretation of the record. This being a declaratory judgment case the law declared by us is necessarily referable to the facts used by us in formulating our statement of the law. As the facts vary so could the law.

The trial court's finding that the side wall coring tool is "rented" is, in our opinion, an erroneous legal conclusion drawn from undisputed facts.

Appellee also complains that the record shows that taxing authorities are not enforcing the tax statute involved here against all who come within its scope as construed by us in this opinion and claims unlawful discrimination under art. VIII, Sec. 2, of our Constitution which, in part, provides that "All occupation taxes shall be equal and uniform * * *."

This commandment of the Constitution appears to require not only that tax laws be equal and uniform in form but that they be executed in the same manner. Hoefling v. San Antonio, 85 Tex. 228, 20 S.W. 85, 16 L.R.A. 608; City of Houston v. Baker, Tex.Civ.App., Galveston, 178 S.W. 820 (writ ref.).

The question presented, however, is not within appellee's pleadings and we express no opinion thereon.

The motion is overruled.

Motion overruled.