**James Latham DANIEL, Jr., Appellant,**

v.

**Jean Warren DANIEL, Appellee.**

**No. 01–88–00420–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 12, 1989.

Rehearing Denied Nov. 9, 1989.

Ted Hirtz, Houston, for appellant.

Robert J. Piro, Pamela E. George, Piro & Lilly, Houston, for appellee.

Before EVANS, C.J., and WARREN and COHEN, JJ.

## OPINION

EVANS, Chief Justice.

This is an appeal from a divorce decree that confirmed the validity and enforceability of a post-nuptial property agreement and, pursuant to said agreement, effected a division of the parties' marital estate.

The parties to this action, Mr. and Mrs. James Daniel, married in February 1981. After five years of marriage, they entered into a "Property Agreement," dated February 14, 1986, which is the principal subject of this dispute. In this Property Agreement, which covered properties owned, both separate and communal, each spouse agreed that: (1) all income, on and after the date of the Agreement, from a spouse's separate property (owned then or in the future) would become the separate property of that spouse; (2) all monies earned through a spouse's personal services and efforts would become the separate property of that spouse; (3) past and future trust distributions to Mrs. Daniel from any trust created by her prior to the marriage would become her separate property; and (4) trust distributions to Mr. Daniel, from any trust of which he was the beneficiary, would become his separate property. The Property Agreement also provided that each spouse transfer to the other spouse, as the other's separate property, such rights, claims, and property interests as were consistent with, and in furtherance of, the provisions of the Agreement.

Historically in Texas, a husband and wife could not, by "mere agreement," change their community property into separate property. *See Kellett v. Trice*, 95 Tex. 160, 170, 66 S.W. 51, 54 (1902); Cameron, Hoffman & Yutterberg, *Marital and Premarital Agreements*, 39 Baylor L.Rev. 1095 (1987). In 1980, however, Texas voters approved an amendment to art. XVI, sec. 15 of the Texas Constitution, which allows a

husband and wife, without prejudice to pre-existing creditors, to enter into written agreements for the partition or exchange of their community interests into separately owned properties. To implement this constitutional amendment, the 67th Legislature amended subchapter C of chapter 5 of the Texas Family Code, effective September 1, 1981.[1] Six years later, the 70th Legislature again amended subchapter C, designating it "Property Agreements," and dividing it into two parts.[2]

In this case, we are concerned only with Part 2, sections 5.52, 5.53, and 5.55, which pertain to post-nuptial agreements. These sections provide:

Sec. 5.52. Partition or Exchange of Community Property.

At any time, the spouses may partition or exchange between themselves any part of their community property, then existing or to be acquired, as they may desire. Property or a property interest transferred to a spouse by a partition or exchange agreement becomes his or her separate property.

Sec. 5.53. Agreements Between Spouses Concerning Income or Property Derived from Separate Property.

At any time, the spouses may agree that the income or property arising from the separate property then owned by one of them, or which may thereafter be acquired, shall be the separate property of the owner.

Sec. 5.55. Enforcement.

(a) A partition or exchange agreement is not enforceable if the party against whom enforcement is sought proves that:

(1) that party did not execute the agreement voluntarily; or

(2) the agreement was unconscionable when it was executed and, before execution of the agreement, that party:

(A) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(B) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(C) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

(b) An issue of unconscionability of a partition or exchange agreement shall be decided by the court as a matter of law.

Tex. Fam.Code Ann. secs. 5.52, 5.53, and 5.55 (Vernon Supp.1989).

Mrs. Daniel instituted this divorce action on September 23, 1987. By answer and counterclaim to her supplemental petition, Mr. Daniel asserted that the Property Agreement was unenforceable and should be set aside on theories of fraud, unconscionability, unjust enrichment, and breach of fiduciary duty.

The case was tried to a jury, and when both sides rested, the court directed a verdict in favor of Mrs. Daniel. In its judgment, the trial court concluded in part:

Only three issues, under the pleadings and evidence, and the stipulation of counsel were in dispute as follows:

(1) the validity and effectiveness of the provisions of the *Property Agreement* between the parties dated February 14, 1986 concerning:

(a) the retroactive characterization of income;

(b) the transfer of Husband's interest in accumulated income earned *prior to* the date of the Agreement on Wife's separate property, particularly the Jean Warren Young Trust "A".

(2) the ownership and partition of an IRS refund check for calendar 1986, and the ownership of a claim for refund for calendar 1983; and

(3) the award of attorney's fees and expenses.

---

1. Ch. 782, sec. 2, 1981 Tex.Gen.Laws 2964, 2964–65, amending sections 5.41 and 5.42, and adding sections 5.43, 5.44, 5.45, and 5.46.

2. Ch. 678, sec. 1, 1987 Tex.Gen.Laws 2530, effective September 1, 1987. Part 1, entitled "Uniform Premarital Agreement Act," includes sections 5.41–5.50, and Part 2, entitled "Other Property Agreements," includes sections 5.51–5.56.

The Court was of the opinion that FC § 5.55 is to be utilized in determining the enforceability of the *Property Agreement* of the parties dated February 14, 1986. The Court finds that there are no pleadings nor any evidence suggesting that Respondent did not voluntarily execute said agreement as provided by FC § 5.55(a)(1). The Court further finds that said agreement is not unconscionable as a matter of law as provided by FC § 5.55(a)(2) and § 5.55(b). The Court further finds that the common law defenses asserted by Respondent have been superseded by FC § 5.55 but, nevertheless, finds there is not sufficient evidence to warrant submission of special issues thereon to the jury. Accordingly, the Court finds that said agreement is valid and enforceable as a matter of law. The Court further finds that it is undisputed that the federal income tax paid by the parties in 1983, 1984, 1985 and 1986 was paid (except for a small payment made by Respondent in the form of withholding) by a trust established by Petitioner in 1959 which, under the Property Agreement dated February 14, 1986, is her separate property.

In separate amended findings of fact and conclusions of law, the court found that Mr. Daniel voluntarily executed the Property Agreement, and that the evidence was insufficient to warrant submission of special issues on any common law defense. The court concluded, as a matter of law, that the agreement was not unconscionable and that it was valid and enforceable.

On this appeal, Mr. Daniel asserts 18 points of error, which are grouped to reflect common issues.

We first consider Mr. Daniel's points of error 1, 13, 14, and 15, in which he contends that the court erred in determining the enforceability of the Property Agreement under the current Tex.Fam.Code Ann. sec. 5.55 (Vernon Supp.1989), rather than the 1981 version of that section.

**3.** We further note that our supreme court has recently held a court of appeals is bound to apply the law as it existed at the time the divorce decree was signed. *Sadler v. Sadler*, 769

■ In 1987, when the 70th Legislature amended chapter 5 of the Texas Family Code, it did not expressly provide that the amendatory provisions should be given retrospective application. In the absence of such a provision, the amendment would not usually be applied retrospectively to agreements executed before its effective date. *See Brooks v. Texas Employers Ins. Ass'n,* 358 S.W.2d 412, 413–14 (Tex.Civ.App.— Houston 1962, writ ref'd n.r.e.). However, the general rule does not control here, because the amendatory statute is both procedural and remedial in nature. *See Phil. H. Pierce Co. v. Watkins,* 114 Tex. 153, 158, 263 S.W. 905, 907 (1924). Section 5.55 establishes a statutory procedural scheme for challenging the enforceability of a postnuptial property agreement executed pursuant to the statute. The amendatory provisions simply set forth the revised procedures to be followed by the courts in litigation öccurring after the effective date of the amendment.[3] Thus, the trial court properly applied the provisions of section 5.55 to Mr. Daniel's action challenging the validity of the Property Agreement.

■ Mr. Daniel also argues, under these same points, that section 5.55 is inapplicable to the Property Agreement because it is not "a partition or exchange agreement," as that term is used in section 5.55.

We also disagree with this argument. There is no indication that the legislature intended, by using the general term "partition or exchange agreement" in section 5.55, to limit the enforcement provisions of that section to those agreements covered by section 5.52, entitled "Partition or Exchange of Community Property," and not those agreements covered by other sections of subchapter C, Part 2, as "Other Property Agreements." It seems evident that the legislature intended income arrangements between spouses, which are covered by section 5.53, entitled "Agreements Between Spouses Concerning Income from Property Derived," to be enforced in the same man-

S.W.2d 886 (Tex.1989). The decree in this case was signed on March 18, 1988, when the current section 5.55 was in effect.

ner as partition and exchange agreements covered by section 5.52.

In construing a statute, we must adopt an interpretation that will carry out the legislature's manifest purpose and intent. *Coastal States Gas Producing Co. v. Pate,* 158 Tex. 171, 176, 309 S.W.2d 828, 831 (1958). In ascertaining such intent, we must consider that the legislature intended a fair, reasonable, and sensible construction. *Clark v. Pearson & Co.,* 121 Tex. 34, 45, 39 S.W.2d 27, 32 (1931); *Calvert v. A–1 Bit & Tool Co.,* 256 S.W.2d 224, 231 (Tex. Civ.App.—Austin 1953, writ ref'd n.r.e.).

We perceive no rational basis for the legislature to have intended spouses' post-nuptial income arrangements, covered by section 5.53, to be enforced differently from partition and exchange of community property agreements, covered by section 5.52. Thus, we hold that the trial court properly applied the enforcement provisions of section 5.55 to all aspects of the Property Agreement, including those provisions relating to income derived from separate properties.

We accordingly overrule Mr. Daniel's points of error 1, 13, 14, and 15.

Secondly, we consider Mr. Daniel's contentions, under points of error 7 through 12, that assert the trial court erred in deciding, as a matter of law, that the evidence was legally insufficient to warrant the submission of issues to the jury on Mr. Daniel's asserted common law defenses. Although Mr. Daniel does not enumerate in his brief the common law defenses he sought to have submitted to the jury, his answer and counterclaim to Mrs. Daniel's supplemental petition suggest they are in the nature of actual and constructive fraud, breach of fiduciary duty to make full disclosure, and unjust enrichment.

■ Preliminarily, the legislature did not expressly provide that the enforcement provisions of section 5.55 constitute the exclusive remedy for challenging the en-

forceability of a property agreement executed pursuant to the Family Code. Therefore, we must look to the language of the statute to determine if the legislature intended that result.

As we view the statute, the legislature simply intended to recognize the validity of voluntary property agreements between a husband and wife, when such agreements were not unconscionable, and were based on a fair and reasonable disclosure of the parties' respective assets and financial obligations. Although the statute places the burden of proof on the party challenging the enforceability of a property agreement, it also alleviates the need for proof of all elements required in common law defenses.[4]

■ Because the amendatory statute is procedural and remedial in nature, we must adopt a construction that, in the absence of an express legislative provision to the contrary, will prevent forfeiture of a valuable right or remedy. *Stephenson v. Stephenson,* 22 S.W. 150, 151 (Tex.1893); *Hope Oil Corp. v. Humble Oil & Refining Co.,* 43 S.W.2d 272, 273 (Tex.Civ.App.—San Antonio 1931, no writ).

We conclude that the legislature, by the enactment of the enforcement provisions of section 5.55, did not intend such provisions to replace all common law defenses, and that the statute simply provides an additional statutory remedy for persons challenging property agreements executed pursuant to the Family Code. *Compare Smith v. Baldwin,* 611 S.W.2d 611, 616–17 (Tex.1980) (Texas Deceptive Trade Practices Act held not to displace common law remedies). We accordingly hold that the trial court erred in deciding, as a matter of law, that section 5.55 superseded Mr. Daniel's common law defenses.

■ We now address Mr. Daniel's assertions that the trial court erred in instructing a verdict in Mrs. Daniel's favor, based on its determination that the evidence was

---

4. Under section 5.55, the challenging party simply has to prove: (a) that the agreement was involuntary; or (b) that it was unconscionable, and that he or she was not provided, and did not effectively waive, his or her right to a fair

and reasonable disclosure about the other party's assets and liabilities. Thus, the contesting party does not have to prove knowledge or reliance, as would be necessary in a fraud common law defense.

legally insufficient to justify submission of common law defenses to the jury.

The issues raised by Mr. Daniel's assertions are: (1) does the record contain any evidence that Mrs. Daniel failed to make good faith disclosure of material facts within her knowledge; and (2) if there was such evidence, does the record conclusively establish that Mr. Daniel voluntarily and intelligently waived his right to such disclosure.[5]

Texas courts have closely scrutinized property agreements made by spouses during marriage. Because of the confidential relationship between a husband and a wife, courts have imposed the same duties of good faith and fair dealing on spouses as required of partners and other fiduciaries. *See Johnson v. Peckham,* 132 Tex. 148, 151–52, 120 S.W.2d 786, 787–88 (1938); *Miller v. Miller,* 700 S.W.2d 941, 945–47 (Tex. App.—Dallas 1985, writ ref'd n.r.e.); *Bohn v. Bohn,* 455 S.W.2d 401, 405 (Tex.Civ.App. —Houston [1st Dist.] 1970, writ dism'd w.o. j.).

Because Mr. Daniel appeals from a directed verdict, every inference that may properly be drawn from the evidence must be indulged in his favor, and if there is evidence of probative value requiring the jury's decision on either of these issues, the trial court's judgment must be reversed. *See White v. White,* 141 Tex. 328, 331, 172 S.W.2d 295, 296 (1943); *Estate of Grimes v. Dorchester Gas Producing Co.,* 707 S.W.2d 196, 201 (Tex.App.—Amarillo 1986, writ ref'd n.r.e.).

The thrust of Mr. Daniel's complaint is that Mrs. Daniel and her attorney failed to disclose the existence of over $1 million of community income, which had accumulated to Mrs. Daniel's separate property in a grantor trust designated in the Property Agreement as "Trust A." Mr. Daniel contends he was not given complete access to this information, and that Mrs. Daniel's failure to disclose the accumulation of her income amounted to constructive fraud.

Mr. Daniel is a licensed attorney and a certified public accountant. He graduated from the University of Texas in 1951 and, after serving two years in the army, worked as a state bank examiner. He returned to school for an accounting degree, and in 1960 or 1961, he earned a certified public accounting certificate. Mr. Daniel then worked for the national accounting firm of Ernst and Ernst, continuing his academic studies in the evenings at the University of Houston Law Center. He earned a law degree in 1967. Mr. Daniel then worked for Fish Engineering Company, marrying his first wife, the daughter of Ray Fish, the founder of that company. He was employed as vice-president and assistant to the president of Fish Engineering before he started his own venture capital firm, known as Daniel Enterprises, Inc. Mr. Daniel owns substantial assets as separate property, including a remainder interest under a testamentary trust established by his father's will.

Mrs. Daniel was the youngest daughter of the founder of Warren Petroleum Company in Oklahoma. In 1959, her parents gave her substantial sums of money, which she placed in a newly established trust created for her own benefit. This trust is referred to in the Property Agreement as "Trust A." At the time of trial, the trust res was valued at about $12 million.

Both Mr. and Mrs. Daniel had prior marriages, and children by those marriages. In the fall of 1985, Mrs. Daniel, after preliminary discussion with Mr. Daniel, went to see Mr. Tom Eubanks of the law firm of Baker & Botts to discuss a post-nuptial agreement. Mr. Eubanks was a mutual friend of the Daniels and had served on a bank board with Mr. Daniel. After several months delay, due to the death of Mrs. Daniel's daughter, Mr. Eubanks prepared drafts of a proposed agreement, which culminated in the Property Agreement that is the subject of this suit. Mr. Eubanks testified that this was a "vigorously negotiated

---

**5.** Mr. Daniel does not contend that Mrs. Daniel made affirmative misrepresentations concerning her properties, and on oral submission, he stipulates there is no evidence showing an intent to defraud. He contends only that Mrs. Daniel failed to meet her fiduciary duty to fully disclose the extent of the income that had accumulated to her separate properties.

transaction," which the parties negotiated at "arms-length." Essentially, the Agreement provided that the income from Mrs. Daniel's separate property and efforts was to be her separate property, and income from Mr. Daniel's separate property and efforts was to be his separate property. The Agreement also provided that income from Mrs. Daniel's separate trust property, which had been community property when first earned, would become her separate property.

At the instance of Mr. Eubanks, Mr. Daniel had the proposed Property Agreement reviewed by Mr. Thomas Crowell of the law firm of Hutcheson & Grundy. Mr. Crowell testified that the Agreement had been negotiated in a friendly and amicable manner, and that Mr. Daniel had agreed to make the Agreement to preserve marital harmony with his wife. Mr. Crowell said that his assignment from Mr. Daniel was limited to a review of specific areas of the Agreement, and that he did not have a full picture of the parties' entire financial situation. He testified that he did not pass on the fairness of the contract because Mr. Daniel did not ask him to do so.

On the day the document was executed, Mr. Eubanks, at the written suggestion of Mr. Daniel, inserted in the final draft some additional language that referred for the first time to Mrs. Daniel's "Trust A," as well as to "any other trust created by wife prior to the marriage of the parties."

Mr. Daniel testified that he was acting as a husband, not as a professional, in dealing with the Property Agreement, and that he was trying to accommodate his wife's wishes in doing so. He said he was unaware that more than $1 million of community income had been accumulated and was being held in "Trust A."

Mr. Daniel contends that, because he negotiated with his wife "out of a sense of trust," her failure, and that of her attorney, to disclose vital information to him constituted a constructive fraud.

We disagree with Mr. Daniel's contention. We find no evidence of any act of bad faith on the part of Mrs. Daniel or her counsel. Instead, the evidence conclusively establishes, as a matter of law, that Mr. Daniel was given reasonable opportunity to ascertain the true facts, and that he knowingly chose not to follow that opportunity.

The record shows that Mr. and Mrs. Daniel filed joint income tax returns for the years 1981 to 1986. Mr. Chris Parsons of Deloitte, Haskins & Sells, the accounting firm that prepared these returns, testified that the returns showed line by line the various types of entities and the income generated by them. Among these income-generating entities was "Trust A." Mr. Daniel admitted that he had reviewed the tax returns and that he had not misunderstood their import. He knew, therefore, that "Trust A" generated substantial income for each of the years during his marriage to Mrs. Daniel.

At trial, and on this appeal, Mr. Daniel complains that, even though he knew that sizeable amounts of income were accruing to "Trust A," he did not know, and Mrs. Daniel never advised him, the trust income was being accumulated and was not being distributed. He testified that Mrs. Daniel sometimes complained to him that too much of the income was being distributed for charitable purposes, leaving him with the impression that there was very little left in the trust after such contributions.

At trial, Mr. Daniel was examined about his review of the income tax returns, and whether he could have determined the amount of charitable contributions being made from income accruing to "Trust A."

Q. Now couldn't you have read the income tax returns that you signed and found out precisely how much money was donated to the family hospital and other family charities around Tulsa?

A. Yes.

Based on this and other testimony of Mr. Daniel, the trial court could have determined, as a matter of law, that Mr. Daniel had information available to him from which he could readily have learned the amount of undistributed income in "Trust A," had he chosen to have that information.

Mr. Daniel also complains that he did not know, and had never been advised, about

income accruing from certain tax-free bonds in Mrs. Daniel's custody account. He acknowledged, however, that he did know Mrs. Daniel had "a number of tax free bonds."

Mr. Daniel further admitted that he never asked his lawyer, Mr. Crowell, to inquire into the distribution of the income from "Trust A," or the extent of the income accruing to the tax-free bonds. He simply explained that his purpose in making the Property Agreement was to provide his wife "comfort" regarding her estate and her assets, and that he had not been interested in the size of her estate. He said he had not asked any questions about the extent of her properties *because of their mutual understanding that he would not inquire into her properties, and she would not inquire into his.*

Mr. Daniel also acknowledged that he had read and understood the following stipulations in the Property Agreement:

Each of the Parties acknowledges that the other has fully acquainted him or her with the other's means and resources, that he or she has ascertained and weighed all of the facts, conditions, and circumstances likely to influence his or her judgment.

Husband acknowledges that he realizes that the total of Wife's Income and said trust distribution is now substantially greater than the total of his Income and said trust distributions.

Each of the Parties recognizes that this Agreement may be substantially more beneficial, overall and as to particulars, to one than the other and that each nevertheless wishes to enter into this Agreement.

This Agreement sets forth the entire understanding of the Parties as to the subject matter of this Agreement; and neither Husband nor Wife has relied upon any representation of the other, except as those representations are especially set forth in this Agreement.

When one spouse knowingly elects not to inquire into matters that affect his or her interest, he or she may not later complain that he or she did not know the full circumstances of the transaction. *See Chiles v. Chiles,* 779 S.W.2d 127 (Tex.App.—Houston [14th Dist.], 1989); *Kennell v. Kennell,* 743 S.W.2d 299, 300–01 (Tex.App.—Houston [14th Dist.] 1987, no writ); *Neill v. Neill,* 386 S.W.2d 642, 646–47 (Tex.Civ.App. —Austin 1965, writ dism'd w.o.j.); *Brownson v. New,* 259 S.W.2d 277, 282–84 (Tex. Civ.App.—San Antonio 1953, writ dism'd w.o.j.) (op. on reh'g); *Bankston v. Bankston,* 251 S.W.2d 768, 773 (Tex.Civ.App.— Dallas 1952, no writ).

Mr. Daniel is a licensed attorney, a certified public accountant, and an experienced businessman. He admitted he read and understood the terms of the Property Agreement, as well as the joint income tax returns he and his wife filed during the six years of their marriage. He knew of the sizeable amount of income accruing to "Trust A," and he knew that his wife owned a number of tax-free bonds. However, for his own, albeit laudable motives, i.e. his concern for the mental comfort of his wife, he voluntarily chose not to make any inquiry into those matters. He also instructed his attorney not to make any such inquiry for him. Moreover, when Mr. Daniel executed the written Property Agreement, he confirmed in writing his choice not to make any inquiry into the value and extent of his wife's property. Under these undisputed facts, the trial court did not err in concluding, as a matter of law, that Mr. Daniel presented no evidence justifying the submission of common law defenses to the jury.

Accordingly, while we sustain Mr. Daniel's point of error seven, we overrule his points of error 8 through 12, and in so doing, find point of error seven to have been harmless. *First Employees Ins. Co. v. Skinner,* 646 S.W.2d 170, 172 (Tex.1983).

For the same reasons as discussed above, we also overrule Mr. Daniel's points of error four, five, and six, in which he contends that the trial court erred in refusing to submit issues on: (1) whether he had fair and reasonable disclosure of the property or financial obligations of Mrs. Daniel before signing the Property Agreement;

(2) whether he could have had actual knowledge of the property or financial obligation of Mrs. Daniel before signing the Property Agreement; and (3) whether he voluntarily and expressly waived in writing any right to disclosure of the property or financial obligations of Mr. Daniel. We hold, as stated earlier, that the trial court properly determined, as a matter of law, that there was no evidentiary basis for submission of these issues to the jury.

In view of our disposition of the foregoing points of error, we need not consider Mr. Daniel's contention, asserted under point of error two, that the trial court erred in concluding, as a matter of law, that the Property Agreement was not unconscionable. Nor do we need to consider his assertions, made under points of error 3 and 18, that the court applied an erroneous standard in determining the issue of unconscionability.

Finally, in points of error 16 and 17, Mr. Daniel contends that the trial court erred in finding that the Daniels' federal income tax for the years 1983 through 1986 had been paid principally from Mrs. Daniel's "Trust A," rather than from the income of such trust. As we interpret these points of error, Mr. Daniel contends there is no evidence, or factually insufficient evidence, to support the trial court's finding.

In cross-examination of Mr. Daniel, he was asked:

Q. Mr. Daniel, you heard Mr. Parsons testify earlier that all of the income taxes reported on your '84, 5 and 6 income tax returns were paid by Jean Daniel from Trust "A". You heard him say that?

A. Yes.

Q. You don't quarrel with that, do you?

A. No.

Based on this testimony, the trial court did not err in determining as a matter of law, that the income tax for the years in question was paid out of Mrs. Daniel's trust fund.

We accordingly overrule these two points of error.

We affirm the judgment of the trial court.

COHEN, Justice, concurring.

I agree with the result and most of the reasoning in the majority opinion, but, unlike the majority, I would hold that Family Code § 5.55 provides the exclusive means of attacking a post-marital property agreement. This section of the Family Code was enacted in order to make it easier to enforce marital property agreements. *Compare Sadler v. Sadler*, 769 S.W.2d 886 (Tex.1989) (construing the purpose of Section 5.46). It accomplished this by shifting the burden of proof to the spouse attacking the property agreement. In so doing, the legislature did not enact a cumulative remedies provision as it did, for example, in the Deceptive Trade Practices Act. Section 5.55, relating to post-marital agreements, was amended in the same bill that amended the present sec. 5.46 of the Family Code, which was part of the Uniform Premarital Agreement Act. The language of sections 5.55 and 5.46 is nearly identical.

I doubt that the legislature would have enacted such statutes, if it simultaneously intended to retain all the non-uniform common-law defenses that made it so difficult to uphold marital property agreements. If common-law defenses are still available, the legislature has made it harder to uphold marital property agreements by retaining all the old traps, while adding two new ones in the form of sections 5.55 and 5.46.

One court has recently disregarded a jury finding that a property agreement was unfair. It upheld the challenged agreement because there was no evidence of the elements required by sec. 5.46. *Chiles v. Chiles*, 779 S.W.2d 127 (Tex.App.—Houston [14th Dist.], 1989). This is the same as holding that sec. 5.46 is the exclusive means of challenging a premarital agreement. I would follow *Chiles* and extend it to hold that sec. 5.55 is the exclusive means of challenging a post-marital agreement.