**ESTATE OF Marie E. GRIMES, et al., Appellants,**

v.

**DORCHESTER GAS PRODUCING COMPANY, et al., Appellees.**

No. 07–84–0308–CV

Court of Appeals of Texas, Amarillo.

Feb. 27, 1986.

Rehearing Denied April 1, 1986.

Second Rehearing Denied April 22, 1986.

E.B. Grimes, Robstown, Meredith, Donnell & Abernethy, M.W. Meredith, Jr., Corpus Christi, for appellants.

Strasburger & Price, Leo J. Hoffman, Dallas, Gibson, Ochsner & Adkins, S. Tom Morris, Culton, Morgan, Britain & White, Charles R. Watson, Jr. and William A. Hill, Amarillo, for appellees.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

BOYD, Justice.

Appellants E.B. Grimes, Frances Grimes, the Estate of Marie E. Grimes, deceased, acting by E.B. Grimes, Independent Executor, and the Estate of T.M. Grimes, deceased, acting by Frances Grimes, Independent Executrix, bring this appeal from an adverse judgment in favor of appellees Dorchester Gas Producing Company, Northern Natural Gas Company, L.R. Hagy, Frank Aderton, Jr., Elaine Aderton Lisle, Sybil B. Harrington, and the Don and Sybil Harrington Foundation. In their suit, appellants sought a declaration that an oil and gas lease covering their 191.22 acres of land, which had been included in a 640.22 acre "consolidated area," had terminated. At trial and at the conclusion of appellants' presentation of their case-in-chief, the trial court withdrew the case from the jury and rendered the questioned take-nothing judgment. We affirm that judgment.

Appellants attack the judgment in nine points of error. In those points, they assert the trial court erred in rendering its judgment because (1) there was probative evidence that the oil and gas lease here in question had terminated under its provisions; (2) there was probative evidence that there had been no consolidation of the lease with other leases in accordance with the applicable contractual provisions; (3) there was probative evidence that any gas production from the Bednorz No. 4 well, Dorchester Unit No. 9, was not legal production and therefore did not keep in force the Grimes lease; (4) there was probative evidence that appellants' claims were not barred by any statute of limitations, waiver, estoppel, ratification, or adverse possession; (5) there was probative evidence that appellee Dorchester wrongfully refused to release an oil, gas, and mineral lease, resulting in damage to appellants; (6) defendant John Kotara, Jr.'s answer was a disclaimer which asked that judgment be

granted to appellants; and (7) no answers had been filed by defendants Erskin Grayson and Tom Marsh, agent for the Ida Marsh heirs, who did not appear at trial and were in default.

On December 31, 1936, appellants' predecessors-in-title, E.H. Grimes, Marie E. Grimes, and Amanda Busch executed an oil and gas lease in favor of Dorchester's predecessor-in-title, Stanley Marsh. The lease was dated December 31, 1936, and was for an initial term of five years beginning December 13, 1937, and continuing thereafter so long as there was production of oil or gas under the lease. Under the lease, the lessee was required to begin drilling operations on or before the first anniversary date or to pay annual delay rentals of $1.00 per annum until drilling commenced. The lease granted the lessee the right to consolidate the leased lands with "adjacent lands, provided any resulting consolidated estate shall not cover and include more than 640 acres consisting of contiguous tracts or tracts that are adjoined," with drilling or production from any well on any of the consolidated lands being sufficient to satisfy the terms of the lease. The property covered by the lease was described as:

> That part of the W ½ of Sec. 2 and that part of Sec. 3, Blk. 7, I. & G.N. Ry. Co. Survey, which are situated south of the right-of-way of P & SF Ry. Co., containing 131.22 acres, more or less; NW ¼ of NW ¼ and W ½ of NE ¼ of NW ¼ of Sec. 21, Blk. 7, I. & G.N. Ry. Co. Sur., containing 60 acres, more or less; and containing 191.22 acres, more or less.

The railroad right-of-way was obtained by condemnation in 1887 and, admittedly, was an easement for surface use.

On June 18, 1937, an instrument denominated as a "Gas Division Order and Operating Agreement" was executed by appellants' predecessors-in-title which covered 108.95 acres of the leased property. That portion of the leased property was described as "situated" south of the railroad right-of-way. In the instrument, other lands were specifically described and were consolidated with the 108.95 acre tract in a 637.95 acre tract designated as the "consolidated area." The owners of the other tracts of land also executed the agreement. In the agreement, it was provided that the completion of a well producing gas in paying quantities within the "consolidated area" would perpetuate lessee's rights under all the leases in the entire area. Moreover, in the instrument, appellants' predecessors-in-title ratified and affirmed the December 31, 1936 lease "as hereby modified."

Drilling of a well designated as the Bednorz No. 4 well commenced on October 14, 1937. Although the well was not located upon any part of the property here in controversy, it was located upon other property included in the "consolidated area" described in the 1937 operating agreement. The well was completed as a gas well on November 12, 1937, and production commenced on November 15, 1937. Physical production from the well in paying quantities has continued since that time. Monthly royalty checks were paid to appellants continuously until November 1979, when appellants refused any further payments. Subsequent to November 1979, the payments have been placed in a suspense account.

Delay rentals on the 82.27 acres not included in the 1937 operating agreement were paid to appellants' predecessors-in-title in November of 1938 and 1939. On June 1, 1940, appellants' predecessors-in-title executed a "Gas Order and Operating Agreement" which was in substitution for and superseded the June 18, 1937 agreement. In this instrument all of the property in the original oil and gas lease was included with other property in a 640.22 acre tract collectively designated as a "consolidated area." Parenthetically, we note that, in describing property covered by the agreement, reference was made to the Grimes lease and the 191.22 acre tract was described exactly as it was in the original lease. In this instrument, payment of the royalty due thereunder was calculated and set out and it was again agreed that any

production within the "consolidated area" would continue the included leases in force. It also provided that the underlying leases, including the one here in question, were, "as hereby modified," ratified and affirmed. Again, we note the Bednorz No. 4 well, although not located upon the property of appellants' predecessors-in-title, was located upon lands included within the property included in the 1940 "consolidated area." The property in question and the railroad right-of-way dividing the lands are shown on the plat below.

BLOCK 4 - I. & G.N. RR. CO. SURVEY

BLOCK 7 - I. & G.N. RR. CO. SURVEY

## CARSON COUNTY, TEXAS

Initially, appellants argue that their testimony that there was no production upon the specific tract covered by the Grimes oil and gas lease was sufficient to establish a prima facie case that the lease had terminated. At that point, they reason, appellees had the burden to present evidence on their own which would justify a continuation of the lease. Then, they say appellants would have had the opportunity to "offer rebutting evidence and exhibits to those affirmative defenses." By rendering judgment when it did, they say that "[t]he trial court failed to determine correctly the point at which Plaintiffs' [appellants'] burden ended, and Defendants' [appellees'] burden began." The thrust of this argument is that appellees' claims of legal consolidation and legal production from the consolidated unit were "affirmative defenses" which must have been established by evidence produced by appellees other than that introduced by appellants. We disagree.

When, under the evidence produced at trial before the jury, a party is entitled to a verdict as a matter of law, the trial court, on its own motion or that of a party, may instruct the jury as to the verdict it may return, or it may withdraw the case from the jury and render judgment. *Welch v. Mathews*, 642 S.W.2d 829, 833 (Tex.App.—Tyler 1982, no writ); 3 R. McDonald, Texas Civil Practice in District and County Courts § 11.25 (rev.1983). In determining whether such action of the court was proper, we must view the evidence in the light most favorable to appellants, the losing party. We must indulge against the court's action every inference that may properly be drawn from the evidence, and, if the record reflects any testimony of probative value in favor of the losing party, we must hold the court's action improper. The instant judgment was properly rendered only if the evidence in the record at the time of that rendition was such that no other judgment could be rendered and appellees were entitled to judgment as a matter of law. *White v. White*, 141 Tex. 328, 172 S.W.2d 295, 296 (1943); *Welch v. Mathews*, 642 S.W.2d at 833; *Santos v. Guerra*, 570 S.W.2d 437, 438 (Tex.Civ.App.—San Antonio 1978, writ ref'd n.r.e.); *Lee v. Chumley Lumber Company*, 465 S.W.2d 414, 416–17 (Tex.Civ.App.—Houston [14th Dist.] 1971, writ ref'd n.r.e.).

Since the instant suit was brought by appellants, the trial court was entitled to make its assessment of the evidence at the time appellants chose to cease producing evidence. In making that assessment it not only could, but was required, to consider all the legally admissible evidence in the record at that time, whether produced by direct or cross-examination.

The execution of the December 31, 1936 lease is undisputed. Paragraph 9 of the lease expressly granted the lessee "the right . . . to consolidate the leasehold estate . . . with the mineral leasehold estate or estates . . . in adjacent lands, provided any resulting consolidated estate shall not cover and include more than 640 acres consisting of contiguous tracts or tracts that are adjoined." In paragraph 9(a) it was provided that "this lease shall be continued in full force and effect as to the land covered hereby and included in any such consolidation of estates so long as gas is or can be produced from any well located on any part of the land included in such consolidation." The execution of instruments culminated in the 1940 agreement. In this instrument, in the language of appellants' brief, "certain lessors, including Plaintiffs' [appellants'] predecessors in title to the lease in question, agreed with Dorchester's predecessor in title to consolidate certain leases," including the instant lease. It is also uncontroverted that one well, the Bednorz No. 4, was drilled on other land included in the consolidated area, if the area was properly consolidated, and that the well had been continuously in production to the date of this trial.

It is appellants' position that production from the well was not sufficient because "both the lease and the consolidation agreement required that any consolidation of lands for drilling and production purposes must be of 'adjacent' and 'contiguous' tracts," and that the land included in the "consolidated area" designated in the 1940 agreement did not meet that requirement. Therefore, they reason, it being undisputed that there was no production from the tract covered by the December 31, 1936 lease, that lease had lapsed. We disagree.

The focus of our discussion is on the 1940 agreement since that agreement modified and superseded the 1936 lease insofar as relevant here. Appellants, pointing out paragraph 5 of the 1940 agreement which provides "that the consolidated area shall not exceed a total of 640.22 acres and shall consist of contiguous tracts," argue that the 200 foot railroad right-of-way physically divided the area sought to be consolidated. Therefore, they say, the tracts sought to be consolidated were not contiguous. Thus, they reason, the attempt to consolidate was ineffective and the oil and gas lease was not extended by the production from the Bednorz No. 4 well.

However, even assuming, arguendo, that the 1936 lease did not cover or include the railroad right-of-way, a matter we do not decide, that fact is not fatal to appellees' judgment. The 1940 agreement, among other tracts, specifically described the 191.22 acre tract as it was described in the 1936 lease. The description concluded with the phrase "the above land ... containing a total of 640.22 acres to be hereinafter collectively designated as the "Consolidated Area." Paragraph 8 of the 1940 agreement specifically provided that the agreement and the rights of lessees "under all leases covering tracts within the consolidated area" were continued in force as long as gas was or could be produced in paying quantities "from any well in said area." Unless it was done in paragraph 5 of the 1940 agreement, the lessors, including appellants' predecessors-in-title, made no contractual requirement that the tracts comprising the "consolidated area" be contiguous.

Paragraph 5 reads as follows:

5. Subject to the limitation that the consolidated area shall not exceed a total of 640.22 acres and shall consist of contiguous tracts, Lessee may at any time change the consolidated area above designated by the addition, removal or substitution of acreage, and all royalties accruing from gas produced from the revised consolidated area shall be divided among and paid to the several acreage owners in the proportion which the acreage owned by them respectively in the revised consolidated area bears to the total acreage contained therein. No tract included in a producing consolidated area shall be removed therefrom unless it be included in another producing area. Such change in the consolidated area shall be effective when Lessee executes and files for record an instrument designating and describing the revised consolidated area, and setting out the proportionate interest of each owner of acreage included therein, and all provisions hereof shall extend to and be applied to such revised consolidated area as if it had been originally designated herein.

Examination of the paragraph reveals that it applies to changes made in the consolidated area by "the addition, removal or substitution of acreage" and the limitation is that the consolidated area as changed "shall not exceed a total of 640.22 acres and shall consist of contiguous tracts." It is not a limitation on the original "consolidated area" which is specifically described in the 1940 agreement. That being the case, it readily appears that production under the Bednorz No. 4 well, being on a tract designated as a part of the "consolidated area," was, by express agreement, sufficient to continue the 1936 oil and gas lease in force. The contract being unambiguous, the general rule is that the courts will enforce the instrument as written. *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 728 (Tex.1981).

Appellants next contend that "any gas production from the Bednorz No. 4 well, Dorchester Unit No. 9, was not legal production and therefore did not keep in force the Grimes lease." The thrust of this argument is that the Railroad Commission orders fixing and allowing gas production in this gas field required production to be from "contiguous acreage" and that both consolidation agreements were in violation of those orders and rules. They further reason that an order of the Railroad Commission is similar to a court order or an act of the legislature. They say that an agreement which violates a statute, or which cannot be performed without violating a statute, or which is in violation of a regulatory rule under a statute, is illegal, void, and cannot be enforced. As a second prong of that attack, they say the original permit was granted upon the representation to the Railroad Commission that the 640 acres assigned to the application consisted of one solid body of land with an indicated single owner named "J.G. Bednorz." Since, they say, the tract was composed of land owned by various owners and was divided by the railroad right-of-way, it was not "contiguous" and was not owned by a single owner, and therefore the permit

was issued because of misrepresentations and cannot stand. We disagree.

■ At the time these instruments, *i.e.*, the oil and gas lease and the operating agreements, were entered into, such agreements were governed by the law of contracts. *Banks v. Mecom*, 410 S.W.2d 300, 302 (Tex.Civ.App.—Eastland 1966, writ ref'd n.r.e.). Appellants do not contest the execution of the leases or of the operating agreements, nor indeed, the authority to pool under the lease. Their argument is that the pooling was done improperly. For the reasons stated above, we have disagreed with appellants on this point and have found the consolidation and pooling was done as contractually agreed.

■ This Court has previously held that actions of the Railroad Commission are not, of themselves, determinative of contractual questions. The reason for this distinction is the well-recognized rule that the Railroad Commission is a conservation body and does not have jurisdiction to effect a change of property rights. *See Elliott v. Davis*, 553 S.W.2d 223, 227 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.). The action of the parties in entering into the contracts here in question was a legal act done in pursuance of a legal objective, *i.e.*, the production of oil and gas.

In support of their proposition that the asserted irregularities and misrepresentations to the Railroad Commission should void the underlying contract, appellants cite such cases as *Woolsey v. Panhandle Refining Co.*, 131 Tex. 449, 116 S.W.2d 675 (1938); *Minardus v. Zapp*, 112 S.W.2d 496 (Tex.Civ.App.—Austin 1938, no writ); *Murren v. Foster*, 674 S.W.2d 406 (Tex.App.—Amarillo 1984, no writ); *Railroad Commission v. Phillips*, 364 S.W.2d 408 (Tex.Civ.App.—Austin 1963, no writ); *F.A. Gillespie & Sons Co. v. Railroad Commission*, 161 S.W.2d 159 (Tex.Civ.App.—Austin 1942, writ ref'd w.o.m.); and *Loggins v. Stewart*, 218 S.W.2d 1011 (Tex.Civ.App.—El Paso 1949, writ ref'd). Each of these cases can be distinguished.

In *Woolsey* the question presented to the Court was whether the parties could contract for workers' compensation injury payments different from those prescribed. Since this was an effort to accomplish an objective specifically prohibited by the workers' compensation law in force at the time, the Court refused to enforce the contract. In *Minardus*, the parties had agreed to apply Civilian Conservation Corps payments in an unlawful manner. Because the subject matter of the contract itself was illegal, the Court refused to enforce it. In *Murren*, the contract in question was for the sale of land purchased through the Veteran's Land Board entered into at a time when the applicable statute specifically forbade alienation of that land. Again, the subject matter of the contract, *i.e.*, sale of land under a Veteran's Land Board contract, was illegal and the Court refused to enforce it. In *Loggins*, the appellant attempted to assert an antenuptial agreement between herself and her deceased husband to defeat the claim of the appellees. The Court concluded that as a matter of law, the ante-nuptial agreement itself was illegal and, therefore was unenforceable. Thus, the Court reasoned, that appellant could not avail herself of that illegality to defeat the opposing parties' claim. The common thread running through all these cases is that the underlying agreements were to accomplish an illegal purpose. For reasons which we have expressed above, the contracts between the parties to this appeal were legitimate and were made to effectuate a legal purpose. Parenthetically, we also note the axiomatic rule that a contract which may be performed in a legal manner is not rendered illegal simply because it may have been performed in an illegal manner. *Wade v. Jones*, 526 S.W.2d 160, 163 (Tex.Civ.App.—Dallas 1975, no writ).

■ The remaining two cases, *Phillips* and *Gillespie* are also distinguishable. In *Phillips*, the question presented to the Court was whether the Railroad Commission had properly determined the outlines of a gas field for proration and, as a corollary thereto, whether the appellees in that

case were estopped to insist upon adherence to the decision of the Railroad Commission even though they had previously and advantageously contended before the Commission the existence of facts that developed to be untrue. In *Gillespie*, the issue presented was, in the words of the Court, "as to whether the Commission has properly interpreted its own general spacing and proration rules" and as to the effect of those rules upon drilling permits issued by the Commission since an operator's right to drill must be acquired in accordance with the provisions of those rules. In neither case was the validity or invalidity of an underlying oil and gas lease *as between the parties* discussed.

Since the actions of the Railroad Commission of themselves cannot be determinative of contractual questions between the parties, *Elliott v. Davis*, 553 S.W.2d at 227, and, since we have above held that the lease and drilling agreements, as between the parties, are valid, it follows that the representations made to the Railroad Commission in obtaining drilling permits would not invalidate the underlying lease. Assuming, arguendo, and only for the purpose of this discussion, misrepresentations were made by the operator to the Railroad Commission to obtain drilling permits, that action would be exclusively punishable under the criminal enforcement provisions of the Texas Natural Resources Code. *Harrington v. Railroad Commission*, 375 S.W.2d 892, 895 (Tex.1964); *Railroad Commission v. De Bardeleben*, 157 Tex. 518, 305 S.W.2d 141 (1957). The legislature has also made statutory enforcement provisions for unauthorized production of gas. *See* Tex.Nat.Res.Code Ann. §§ 86.221 *et seq.* (Vernon 1978).

Our finding that the lease and operating agreements here in question are valid and have been continued in force by the production from the Bednorz No. 4 well requires us to overrule appellants' points one, two, and three. That action obviates the necessity for discussion of the remainder of appellants' points of error with the exception of their eighth and ninth points.

In these points, appellants say the trial court erred in withdrawing the case from the jury at the conclusion of appellants' case-in-chief and rendering its judgment because (1) John Kotara's answer was a disclaimer which asked that judgment be granted to appellants; and (2) no answer to appellants' suit was filed by Erskin Grayson and Tom Marsh, as agent for the Ida Marsh heirs, nor did those persons appear at trial, thereby resulting in their default. Appellants argue these points together and we will likewise consider them together.

■ The question underlying the allegations against these defendants and appellees in this case was common, *i.e.*, the validity of the oil and gas lease dated December 31, 1936 between E.H. Grimes et al. as lessors and Stanley Marsh as lessee. Therefore, their waiver and default affected only a part incapable of being severed from the question at issue. The contest of the other defendants made necessary the resolution by the court of the entire controversy. To have done otherwise, as this record reveals, would have led to irreconcilable judgments of the court. Moreover, prior to trial, appellants had never sought a default or other interlocutory judgment against Kotara or Grayson and Marsh. By proceeding to trial, appellants waived their right to default or interlocutory judgment, *Foster v. L.M.S. Development Co.*, 346 S.W.2d 387, 397 (Tex.Civ.App.—Dallas 1961, writ ref'd n.r.e.), and the trial court correctly resolved the case on the basis of the evidence actually produced before it. Appellants' eighth and ninth points of error are overruled.

There being no reversible error, the judgment of the trial court is affirmed.

## ON MOTION FOR REHEARING

■ In a vigorous motion for rehearing, appellants attack the decision of this Court. In that attack, they raise twenty-three points of asserted error. However, the thrust of those points is related to a single proposition, that being that the "consolidated area" described in the 1940 agreement, because of the bisecting right-of-way strip,

included non-contiguous land. Therefore, they say, that "consolidated area" violated the contiguous lands requirement of Railroad Commission Special Order, Oil & Gas Docket No. 108, Affixing Allowable Production of Sweet and Sour Natural Gas in the Panhandle District of Texas (Dec. 10, 1935). Bottomed on this premise, they say that the production of gas from the Bednorz No. 4 well on the consolidated unit is thus unlawful and does not constitute production which would continue the Grimes lease in force. We disagree and overrule the motion for rehearing.

The power of the Railroad Commission is not derived from the constitution but comes from legislative grants of powers and jurisdiction. The Supreme Court has generally held that the Commission has only such powers as are specifically delegated to the Commission. *Railroad Commission of Texas v. City of Austin*, 524 S.W.2d 262, 267 (Tex.1975); *Humble Oil & Refining Co. v. Railroad Commission*, 133 Tex. 330, 128 S.W.2d 9, 14–15 (1939). As relevant here, the power delegated to the Commission is to regulate production and to prevent waste. It is so well established as to have become axiomatic that the Commission has no power to determine property rights. *Jones v. Killingsworth*, 403 S.W.2d 325, 328 (Tex.1965); *Nale v. Carroll*, 155 Tex. 555, 289 S.W.2d 743, 745 (1956); *Ryan Consolidated Petroleum Corp. v. Pickens*, 155 Tex. 221, 285 S.W.2d 201, 207 (1955); *Magnolia Petroleum Co. v. Railroad Commission*, 141 Tex. 96, 170 S.W.2d 189, 191 (Tex.1943); *Elliott v. Davis*, 553 S.W.2d at 227; *Whelan v. Placid Oil Company*, 274 S.W.2d 125, 130 (Tex. Civ.App.—Texarkana 1954, writ ref'd n.r. e.).

In support of their proposition, appellants cite the statutes in force at the time of the 1940 agreement forbidding the production of gas "in violation of the valid orders of the Commission." They reason that "the record before this Court shows without dispute that gas production from non-contiguous acreage was in violation of Texas law." Pointing to the provisions of the Natural Resources Code Annotated that permit a party whose property interests are damaged by a party who violates "a valid rule or order of the Railroad Commission" (§§ 85.321 and 85.322 and predecessor statutes) to "sue for and recover damages and have any other relief to which he may be entitled at law or in equity," they say they are entitled to rendition or reversal. Again, we disagree.

For reasons which we have heretofore stated, the parties specifically agreed in the 1937 and 1940 agreements that production from the Bednorz No. 4 well was sufficient to perpetuate the constituent leases. Moreover, because of the acceptance of royalties paid by virtue of that production by appellants and their predecessors, appellants are now estopped to deny the validity of the "consolidated area" described in that instrument. *Kuklies v. Reinert*, 256 S.W.2d 435, 444–45 (Tex.Civ.App.—Waco 1953, writ ref'd n.r.e.).

▆▆▆ Moreover, it is also undisputed that the well was drilled under a permit by the Railroad Commission and production permitted therefrom since its completion. It is a well established principle that orders of the Commission, within its delegated authority, are immune from collateral attack and conclusively presumed to be valid unless brought in question in a direct proceeding instituted for that purpose under statutory authority. *Railroad Commission v. Marathon Oil Co.*, 89 S.W.2d 517, 519 (Tex.Civ.App.—Austin 1935, writ ref'd). *See also Trapp v. Shell Oil Co.*, 145 Tex. 323, 198 S.W.2d 424, 439 (1946); *Dunbar v. Fuller*, 253 S.W.2d 684, 686 (Tex.Civ.App. —Austin 1952, writ ref'd). Moreover, even assuming, arguendo, misrepresentations of the type alleged by appellants were made in the application for the well permit, that type of fraud would constitute intrinsic fraud in the obtaining of the Commission order and, accordingly, would not support a collateral attack upon the validity of that order, such as is here made. *Bolton v. Coats*, 514 S.W.2d 482, 487 (Tex.Civ.App.— Tyler 1974), *rev'd on other grounds*, 533 S.W.2d 914 (1975).

In summary, we remain convinced that our disposition of the case is correct. Appellants' motion for rehearing is overruled and the judgment of the trial court affirmed.