**QUESTA ENERGY CORPORATION,**
Appellant,

v.

**VANTAGE POINT ENERGY, INC. and
Sceptre Resources Limited,**
Appellees.

No. 07–93–0303–CV.

Court of Appeals of Texas,
Amarillo.

Nov. 4, 1994.

Rehearing Overruled Dec. 13, 1994.

Culton, Morgan, Britain & White, Charles R. Watson, Jr., Amarillo, for appellant.

Lemon, Shearer, Ehrlich, Phillips & Good, Otis Shearer, Perryton, Conner & Winters, J. David Jorgenson, Tulsa, OK, for appellee.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

BOYD, Justice.

Appellant Questa Energy Corporation (Questa) brings this appeal from a directed verdict in favor of appellees Vantage Point Energy (Vantage) and Sceptre Resources Limited (Sceptre). This appeal arises from a suit filed by Questa alleging that Sceptre failed to honor Questa's preferential right to purchase certain oil and gas interests and seeking either specific performance of the right or damages for the failure to honor that right. The question presented here is whether a preferential right to purchase contained in an oil and gas operating agreement is triggered by a conveyance of interests under the agreement from Sceptre and some of its subsidiary corporations to another sub-

sidiary corporation. For reasons hereinafter stated, we affirm the judgment of the trial court.

This dispute is governed by, and arises out of, a joint operating agreement between the owners of the working interest in various properties including, inter alia, the "Stuart Lease" which covers Section 1148, Block 43, H & TC Survey, in Lipscomb County. At the time of the execution of the agreement, the working interest in the lease was held as follows:

| | |
|---|---|
| Oakwood Resources, Inc. | 50% |
| Sion Exploration, Inc. | 25% |
| Euratex Corporation | 25% |

Questa acquired Euratex's twenty-five percent interest in 1986. A Canadian entity, Oakwood Petroleum, Ltd., acquired Sion's interest. The fifty percent interest of the original operator, Oakwood Resources, Inc., was reduced to 8.5% through sales to the subsequent operator, E.R. Operating Company. The Oakwood Petroleum Corporation held a minor interest and a related company, Corrita Oils Inc., appears to have owned a small interest. We will refer to Oakwood Petroleums, Ltd., Oakwood Resources, Inc., Oakwood Petroleum Corporation and Corrita Oils Inc. collectively as the "Oakwood entities."

Just prior to July 1, 1989, the date of the transfer of assets giving rise to this dispute, the Oakwood entities owned, collectively, 35.8% of the working interest. This interest was distributed as follows:

| | |
|---|---|
| Oakwood Petroleum, Ltd. | 25.0% |
| Oakwood Resources, Inc. | 8.5% |
| Oakwood Petroleum Corp./Corrita | 2.3% |
| | 35.8% |

The Oakwood entities are wholly owned subsidiaries of Sceptre, which is a Canadian company. They are among the thirty-four subsidiaries identified by Sceptre in its annual report filed with the Securities Exchange Commission pursuant to the Securities Exchange Act of 1934.

Vantage is an Oklahoma corporation, formerly named Z.G. Energy Corporation. It became interested in some of the oil and gas properties which Sceptre and its subsidiaries were attempting to market in 1989. There is nothing in the record indicating that Vantage or its progenitor had any prior relationship with Sceptre or its subsidiaries.

Sceptre decided to discontinue its United States operations and to pull out of the U.S. market in 1989, shortly after it acquired Oakwood Petroleum, Ltd. out of the Canadian equivalent of bankruptcy. Thus, when Sceptre contacted Vantage, it was in the process of looking for a buyer, or buyers, to purchase all of its U.S. properties. Parenthetically, Sceptre's U.S. properties represented a relatively small percentage of its total assets.

On November 13, 1989, Sceptre and the Oakwood entities entered into an agreement with Vantage which was denominated as an "Agreement for Exchange of Properties and Securities." The Exchange Agreement detailed the conveyance of the U.S. properties held by the Oakwood entities to Vantage in exchange for a majority of the shares of common stock in Vantage, a promissory note, and cash, such conveyance to be effected July 1, 1989. The Exchange Agreement was amended on February 20, 1990, and was closed on May 1, 1990 by means of an instrument styled "Assignment, Bill of Sale, and Conveyance." At the time of closing, the Oakwood entities conveyed all of their U.S. assets to Vantage. The "Stuart Lease" is included in the some 400 properties and 600 wells included in the conveyance.

The provision in the operating agreement giving rise to Questa's claim is contained in Article VIII(G) and is as follows:

**G. Preferential Right to Purchase:**

Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall

share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no .preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.

Neither Sceptre nor the Oakwood entities notified Questa of the impending sale to Vantage. This lack of notice is undisputed even though there was testimony that a staff attorney for Oakwood Resources, Inc. who prepared the schedules showing the wells subject to the preferential right of purchase, believed the property in question was subject to Questa's preferential right and advised Sceptre's vice president for finance of that belief. Parenthetically, because the problem presented to us requires an interpretation as a matter of law, the staff attorney's opinion is immaterial to our decision.

Questa did not learn of the sale until the instrument conveying the properties to Vantage was placed of record in the Lipscomb County Clerk's office on or about June 4, 1990. After learning of the transaction, Questa contacted Vantage by letter dated July 27, 1990 and expressed an interest in purchasing some gas wells in Hansford County, Texas and in Seward County, Kansas. In that letter, Questa referred to the Stuart #1 well, noting that it owned an interest in that well, "along with a preferential right of purchase under the Operating Agreement." Questa indicated that it "might consider settling the matter of the Stuart Well with [its] purchase of the captioned wells (the Hansford and Seward County wells)." There then ensued correspondence between the parties wherein Vantage denied that Questa had a preferential right of purchase because the Oakwood entities and Vantage were all subsidiaries of Sceptre.

On June 10, 1992, Vantage sent Questa a letter which reiterated its belief that Questa did not "have a preferential right to purchase the Stuart property in Lipscomb County, Texas." However, the letter went on to inform Questa that it "should be aware that the purchase price of this property paid to Sceptre was $175,000" and that the letter was to "serve as notification per the Operating Agreement, Article VIII G, of the purchase price [Questa] must pay (assuming [Questa] ha[d] a preferential right to purchase this property)."

In its response to the June 10 letter, Questa advised Vantage that prior to its receipt of that letter, it had instructed its attorney to file suit. Questa additionally noted that it found the $175,000 purchase price "suspect" and requested "full information concerning the proposed sale including all terms of the offer" as required by the preferential right to purchase. Suffice it to say, the parties failed to reach an agreement and this lawsuit proceeded to the trial giving rise to this appeal.

On November 13, 1989, Sceptre, the Oakwood entities, and Vantage (then named ZG Energy Corporation) entered into an instrument denominated as an "Agreement for Exchange of Properties and Securities." The agreement was amended on February 20, 1990 and closed on May 1, 1990 by the execution of an "Assignment, Bill of Sale, and Conveyance." As material here, at the time of closing, Sceptre and the Oakwood entities conveyed all of their United States properties to Vantage. Those assets included approximately 600 wells on over 400 properties. The transaction was accomplished as a tax-free exchange under section 351 of the Internal Revenue Code.

In exchange for the conveyances, Vantage paid the sum of $4,600,000 in cash (reduced by $900,000 received by the Oakwood entities between July 1, 1989, the effective date of the transaction, and May 1, 1990, the date consideration was transferred), and 81% of the stock in Vantage which was valued at $6,900,000. The stock in Vantage that the Oakwood entities received was distributed pro rata among the entities. The value of the property transferred by the Oakwood entities, as well as the price of the shares of Vantage stock, was based upon an independent valuation made by the petroleum engineering firm of Netherland, Sewell and Asso-

ciates. The remaining 19% of the Vantage stock was held by the shareholders who had previously owned 100% of the stock.

■ In conducting our review of the propriety of this directed verdict, we must view the evidence in a light most favorable to Questa, the losing party. We must indulge, against the trial court's action, every inference that may properly be drawn from the evidence and, if the record reflects any testimony of probative value in favor of the losing party, we must remand the cause for trial. A directed verdict is only proper if the evidence, at the time of the direction, was such that no other judgment could be rendered and the prevailing party is entitled to judgment as a matter of law. *Estate of Grimes v. Dorchester Producing,* 707 S.W.2d 196, 201 (Tex.App.—Amarillo 1986, writ ref'd n.r.e.).

■ The parties join issue on the question as to whether it was Questa's burden to establish that the transaction was a "sale" within the purview of the operating agreement; thus triggering its right to a preferential right of purchase, or whether the burden was on Sceptre and Vantage to establish, as an affirmative defense, that it was not such a "sale." However, to justify the trial court's directed verdict, the record must have been sufficient to establish, as a matter of law, that the transaction was not sufficient to trigger Questa's preferential right of purchase. It is in that light that we consider this appeal.

Questa does not dispute that the Oakwood entities are wholly owned subsidiaries of Sceptre. Although the transaction did not cover all of Sceptre's assets, it did cover all of its assets that were located in the United States. Therefore, the transaction included all of the interests in the properties covered by the operating agreement which Sceptre owned through its subsidiaries, Oakwood entities. The effect of the transaction was to transfer those interests to Vantage, which became a subsidiary of Sceptre by virtue of the Oakwood entities' acquisition of 81% of the Vantage stock.

We do not believe that the qualification of the transaction as a tax-free exchange under section 351 of the Internal Revenue Code has any material effect upon our decision. Our determination in this cause must be made by virtue of state law, not by its effect upon potential federal taxation.

Although other grounds were urged, the trial court based its decision directing a verdict upon the basis that the transaction was not of the nature to trigger Questa's preferential right of purchase. Our initial determination then must be whether the record establishes, as a matter of law, that the trial court's conclusion was correct. Fulfillment of that task requires us to interpret Article VIII(G) of the operating agreement which provides that the preferential purchase right is not triggered by a party's disposal of its interests by "merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock."

■ Although their implementation is sometimes difficult, the rules governing the interpretation of a contract are well established. In construing a written contract, the primary concern of a court is to ascertain the true intent of the parties as expressed in the contract. To achieve that objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and a court will construe the contract as a matter of law. *Id.* To resolve any uncertainty, the wording of the instrument should be considered in light of the surrounding circumstances. *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 519 (Tex.1968).

In this instance, the language of Article VIII(G), which sets forth the instances in which there is no preferential right to purchase, is not ambiguous. That being so, we must next determine the intent of the parties in including this provision in the operating agreement.

In an operating agreement, the preferential right to purchase serves two purposes. First, it assures its holder an opportunity to acquire further interests in the contract area. In joint operating agreements, each owner believes that the other interests in the subject property are of some value. The preferential right, therefore, assures each owner the opportunity to purchase those valuable rights should a co-owner of an interest decide to sell his interest to a third party. It thus allows those owners, who may have been at risk in exploratory efforts which contributed to the development of the property, to have an opportunity to acquire an additional interest in the property before a third party who did not participate in such risks.

Secondly, and perhaps more importantly, a preferential right to purchase ensures that the owners retaining their interest in the contract area have some degree of control in excluding undesirable participants who may not have the necessary financial ability to bear their share of expenditures or who might frustrate development with management and engineering philosophies which current owners oppose. *See, e.g.,* Harlan Abright, *Preferential Right Provisions and their Applicability to Oil and Gas Instruments,* 32 Sw.L.J. 803, 804 (1978) (preferential right provision gives holder an opportunity to make valuable future acquisitions as well as providing the holder a measure of control over who will be involved in the operation and development of property); Gary B. Conine, *Property Provisions of the Operating Agreement—Interpretation, Validity, and Enforceability,* 19 Tex.Tech L.Rev. 1263, 1317 (1988) (two purposes of a preferential right to purchase are to assure holders an opportunity to acquire further interests and to allow holders some degree of control in excluding undesirable participants); Jeffrey J. Scott, *Restrictions on Alienation Applied to Oil and Gas Transactions,* 31 Rocky Mtn. Min.L.Inst. § 15.06 (1985) (because the purpose of preferential purchase rights is to protect against the sale of lease interests to outside third parties, they do not apply to transfers among co-owners); J. David Heaney, *The Joint Operating Agreement, the AFE and COPAS—What They Fail to Provide,* 29 Rocky Mtn.Min.L.Inst. 743, 781 (1983); John S. Sellingsloh, *Preferential Purchase Rights,* 11 Rocky Mtn.Min.L.Inst. 35, 36–37 (1966).

The structure and working of Article VIII(G) discloses the intent of the parties to accomplish the two purposes discussed above. We hold that the "interests" referred to in the contract are those held by a party or parties to the contract. Prior to the transaction in question, those interests were held by subsidiaries of Sceptre. The effect of the transaction was simply to transfer those "interests" to another entity controlled by Sceptre. That being so, the conveyance was not made to an outside entity. Inasmuch as the interest Vantage received continues to be burdened with the preferential right to purchase in the event of a sale to an outsider, Questa was not exposed to the risk of "undesirable outsiders" holding the interest, nor has it lost its potential opportunity in the event of Vantage's sale or contemplated sale to an outsider. Thus, the trial court did not err in rendering its directed verdict.

Accordingly, we must, and do, affirm the judgment of the trial court.