**Joseph M. GUERRA, Appellant,**

v.

**DATAPOINT CORPORATION, Appellee.**

**No. 04–96–00182–CV.**

Court of Appeals of Texas,
San Antonio.

Oct. 22, 1997.

Arthur G. Vega, Law Offices of Arthur G. Vega, San Antonio, for Appellant.

Bridgette Sopper Oliva, James M. Parker, Jr., Butler & Binion, L.L.P., San Antonio, for Appellee.

Before RICKHOFF, LÓPEZ and ANTONIO G. CANTU,[1] JJ.

## OPINION

ANTONIO G. CANTU, Justice (Assigned).

This is an appeal from the granting of a directed verdict in a wrongful termination of employment case. We affirm.

Joseph M. Guerra (Guerra) sued his employer, Datapoint Corporation (Datapoint), in May of 1993, alleging that he had been fired because he "knew or had reason to believe that to sign off on test logs that had not passed the test criteria would constitute an act of deception or fraud upon Datapoint's customers."

## FACTUAL BACKGROUND

Guerra worked for Datapoint from September of 1977 to December of 1989, and was laid off in a company restructuring. In September of 1991, Guerra was rehired to be one of the design engineers on the Hub portion of the ARCNETplus project.[2] The ARCNETplus system was designed to upgrade, to a significantly higher performance, the previous product, ARCNET, which was a local network developed by Datapoint years before. The upgrade was intended to increase the actual speed of the network.

When Guerra was rehired, the design phase on the entire system had reached its middle stages and Datapoint was attempting to create actual working models for testing. Two months after being rehired, Guerra was transferred to another project because of an inability to get along with the other engineer assigned to the Hub project. His new assignment required that he test network interface cards.

In February 1992, Dennis Booserman, Director of Engineering, issued a time schedule for the shipments of the ARCNETplus product to customers. According to the schedule, the boards were to be shipped to customers beginning on April 15, 1992.

At the time of Guerra's new assignment, basic tests were already being conducted on the ARCNETplus network interface cards, analyzing whether all of the messages that were being transferred over the network were being transmitted and received correctly.

In order to determine whether or not a board was functional, Guerra would refer to Datapoint's specifications regarding the product. He kept test logs on the diagnostic tests he ran and on those run by the technicians under his supervision.

In conducting tests, Guerra found that the boards were not meeting the internal design specifications dealing with the accuracy or error rate of transmitted data.[3] According to Guerra, the measured error rate of 106

---

1. Assigned to this case by the Chief Justice of the Supreme Court of Texas.

2. The ARCNETplus product is a networking interface card. A networking product allows communication between computers; that is, it transmits and receives data.

3. It is recognized within the industry that communication products are not error-free and that an error rate defines how many times messages must be transmitted to get them through correctly.

exceeded the error rate given in the specifications of 1011.[4]

Guerra confronted Glenn Larson, Datapoint's Director of Engineering, and informed him that the boards were not meeting the specified error rate. Much effort was exerted in an attempt to meet the specifications, without success. The project began to fall behind the marketing schedule.

Guerra testified that he informed Larson that the boards continued to fail the specification error rate and that Larson responded with the remark that according to "his criteria" the boards were actually passing the tests. Guerra suggested changing the "specifications"[5] but Larson felt that there was not sufficient time. Guerra and Larson disagreed as to whether the boards should be shipped.

Guerra recalled that Larson specifically asked him to sign off on the test logs results because they were passing "Larson's specifications." Guerra would not sign that the boards were meeting the specifications because he viewed that as defrauding the customer and felt that it would be illegal.[6] Guerra was concerned that if a product was shipped that did not meet the specifications and later failed, he would be held responsible as the person who had "passed" the product. He, however, would not have hesitated in approving the boards as they were actually performing if they had passed Datapoint's specifications. According to Guerra, Larson eventually "took the boards from him" and told him "this was not a decision which was good for my career at Datapoint."

Testing was going on in the Quality Assurance Department at the same time tests were being conducted in the Engineering Department. Although the testing was identical, Quality Assurance was testing the system as a complete unit with Datapoint continuing to make modifications in hopes of achieving improvements.[7]

The Manufacturing Department was also testing to ensure that the product to be shipped out met the "interim specifications" of the system as a whole. Tests conducted with standard industry networking software indicated that the ARCNETplus system achieved what Datapoint considered as adequate performance.[8]

The marketing decision was ultimately made by the president of the company, with input from Larson, the Marketing Department, the Manufacturing Department, and the Quality Assurance Department. Although Guerra's recommendation about whether an individual component should be shipped was solicited, he was never in a position to make the ultimate decision to ship or not.

The first shipment of ARCNETplus systems went to European subsidiaries of Datapoint in June of 1992. The shipment consisted of a few boards and a hub to allow the recipients the opportunity to get acquainted with the product.[9] These subsidiaries, in effect, were doing additional testing and trying to simulate the conditions to which the product would be subjected by a customer. Feedback from the subsidiaries provided opportunity for Datapoint to try to resolve apparent problems. Datapoint did not begin to ship the ARCNETplus system to distributors in the United States until July of 1992. Although the product did not meet Datapoint's

---

4. Some of the boards actually passed the tests and those that did were screened and considered good enough to ship.

5. The specifications could be changed at any time by the same Datapoint group that drafted them originally by simply calling a staff meeting.

6. According to Guerra, the boards were generating from one hundred thousand to one million times more error than was allowed in the specifications.

7. Larson was aware that the goals of meeting the specifications was not going to be attained because there were problems with the cable length and error rate.

8. Guerra was not involved in this aspect of the testing, and was not involved in sales or marketing of the product in any capacity. In fact, Guerra only conducted subassembly or "board tests", the assembled product being left to the Quality Assurance Department for final testing under the Director, Chris Ernst.

9. There were a few additional boards sent to the subsidiaries destined to go to selected customers.

original expectations, there was evidence that the product was an improvement over the predecessor ARCNET system. There is nothing in the evidence to show that any customers were harmed by the original shipments. In fact, during the time of Guerra's second tenure with Datapoint, the systems were shipped with a notation that the product did not meet specifications. Moreover, Datapoint notified the customer that if it was not satisfied with the product, the purchase price would be refunded in full.[10]

Two weeks after Guerra's confrontation with Larson regarding the boards, Guerra received his first employment review since rejoining Datapoint. The review indicated that Guerra needed improvement in his ability to work well with others.[11] Guerra was hence transferred to the Quality Assurance Department. This transfer disturbed Guerra because he felt the new assignment was not suited to his skills as a design engineer.

In the Quality Assurance Department, Guerra was under a new supervisor, Chris Ernst. Under Ernst, Guerra was assigned to test a system known as the MINX 2002, a video conferencing system. On July 29, 1992, Guerra was terminated by Ernst for nonperformance and improper taking of vacation time.

Guerra's First Amended Original Petition alleged, in pertinent part:

... Plaintiff knew the boards were not passing the test criteria. Despite repeated demands from Plaintiff's immediate supervisor, Glenn Larson, Director of Engineering and the acting manager of the ARCNETplus project, Plaintiff refused to sign any test logs for failing boards. These test logs were used to document the level of testing the board had undertaken and were to be shipped to the customer in the box along with the board. Due to Plaintiff's refusal to sign the test logs, Plaintiff's employment was terminated by the Defendant on July 29, 1992. Plaintiff knew or had reason to believe that to sign off on

the test logs for boards that had not passed the test criteria would constitute an act of deception or fraud upon the Defendant's customers.

Guerra alleged that his termination was precipitated by his refusal to choose between committing a crime or being fired from his job. Reliance was placed upon the provisions of Texas Penal Code, section 32.42(b)(4), (7), and (12), and the Supreme Court's holding in *Sabine Pilot Service v. Hauck*, 687 S.W.2d 733 (Tex.1985).

Texas Penal Code, section 32.42, in pertinent part provides:

§ 32.42 Deceptive Business Practices

* * *

(b) A person commits an offense if in the course of business he intentionally, knowingly, recklessly, or with criminal negligence commits one or more of the following deceptive business practices:

...

(4) selling an adulterated or mislabeled commodity; ...

(7) representing that a commodity or service is of a particular style, grade, or model if it is of another; ...

(12) making a materially false or misleading statement:

(A) in an advertisement for the purchase or sale of property or service; or

(B) otherwise in connection with the purchase or sale of property or service.

(c) An offense under Subsections (b)(1), (b)(2), (b)(3), (b)(4), (b)(5), and (b)(6) is:

(1) a Class C misdemeanor if the actor commits an offense with criminal negligence and if he has not previously been convicted of a deceptive business practice; or

(2) a Class A misdemeanor if the actor commits an offense intentionally, knowingly, recklessly or if he has been

---

**10.** Some customers purchased the product, did their own testing to determine how it performed in their environment, and others returned the product after being dissatisfied with its performance.

**11.** The record discloses that Guerra experienced the same problem during his earlier tenure with Datapoint.

previously convicted of a Class B or C misdemeanor under this section.

(d) An offense under Subsections (b)(7), (b)(8), (b)(9), (b)(10), (b)(11), and (b)(12) is a Class A misdemeanor.

TEX. PENAL CODE ANN. § 32.42 (Vernon 1994).

The case was called to trial on November 13, 1995. Guerra offered his testimony and the deposition testimony of two Datapoint employees, and then rested. Datapoint, thereupon, moved for a directed verdict based upon Guerra's failure to show that he was forced to choose between being fired or committing any of the acts proscribed by section 32.42 and the subparts alleged by Guerra in his petition. In response, Guerra only urged that he had raised evidence in support of subsections (b)(7) and (b)(12).

On appeal, Guerra alleges in separate, but related, points that the trial court erred in granting the directed verdict and in denying his motion for new trial because the evidence raised a fact issue to be decided by the jury.[12]

## STANDARD OF REVIEW

■ When, under the evidence produced at trial before the jury, a party is entitled to a verdict as a matter of law, the trial court, on its own motion or that of a party, may instruct the jury as to the verdict it may return, or it may withdraw the case from the jury and render judgment. *Estate of Grimes v. Dorchester Gas Producing Co.*, 707 S.W.2d 196, 201 (Tex.App.—Amarillo 1986, writ ref'd n.r.e.).

In reviewing the granting of a directed verdict, we are required to review the record as a whole to determine if there is any conflicting evidence of probative value on any theory of recovery. In doing so, we must view the evidence in the light most favorable to Guerra, the losing party, indulging against the court's action every inference that may properly be drawn from the evidence. If the record reflects any testimony of probative value in favor of Guerra, we must hold the court's action improper. *Szczepanik v. First Southern Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994); *Qantel Business Systems, Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 303–04 (Tex.1988); *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex.1978).

■ Stated otherwise, the instant judgment was properly rendered only if the evidence in the record at the time of that rendition was such that no other judgment could be rendered and Datapoint was entitled to judgment as a matter of law. *Questa Energy Corp. v. Vantage Point Energy, Inc.*, 887 S.W.2d 217, 221 (Tex.App.—Amarillo 1994, writ denied); *Sargent v. Smith*, 863 S.W.2d 242, 248 (Tex.App.—Beaumont 1993, no writ); *Estate of Grimes*, 707 S.W.2d at 201.

But if reasonable minds may differ as to the truth of controlling facts, the issue must go to the jury.[13] *Collora*, 574 S.W.2d at 68.

■ Although Guerra does not discuss the underlying cause of action in his brief other than in the framework of *Sabine Pilot Service v. Hauck*,[14] it is undisputed that Guerra was an at-will employee. The longstanding rule in Texas provides for employment at will, terminable at any time by either party, with or without cause,[15] absent an express agreement to the contrary. *Federal Express*

---

12. Guerra's brief does not specifically address any of the subsections of section 32.42. However, from the body of the brief, it is clear that he is urging that the evidence raised an issue as to subsection (b)(12); e.g., "Datapoint's customers were aware of the allowable error rate; therefore, for the Appellant to have signed off on the error rate test logs would have at the very least constituted a materially false or misleading statement in violation of § 32.42 of the Penal Code." Appellant's Br. at 7.

13. But if the plaintiff's evidence is so meager that reasonable men could not differ as to the conclusion that an issue is not established, the trial

court may grant a directed verdict. *See Currey v. Lone Star Steel Co.*, 676 S.W.2d 205, 209 (Tex. App.—Fort Worth 1984, no writ) (determining that party is entitled to a directed verdict where component element of theory of recovery is supported only by meager evidence).

14. Ironically, Guerra did not rely on *Sabine* in his appellant's brief. The case was first mentioned on appeal in his reply brief.

15. An at-will employee may be terminated for good reason, bad reason, or no reason at all. *Currey*, 676 S.W.2d at 212.

*Corp. v. Dutschmann,* 846 S.W.2d 282, 283 (Tex.1993); *Winters v. Houston Chronicle Publishing Co.,* 795 S.W.2d 723, 723 (Tex. 1990); *Sabine,* 687 S.W.2d at 734. In *Sabine,* the Supreme Court found it necessary to carve out a very narrow exception to the employment at-will doctrine because of public policy as expressed in the various criminal statutes. *See Sabine,* 687 S.W.2d at 735 (creating exception to at-will doctrine where employee refuses to perform illegal act). Thus, it was Guerra's burden to prove by a preponderance of the evidence that his discharge was for no other reason than his refusal to perform an illegal act if he is to remove his case from the at-will scenario. *Id.* at 735.

If Guerra is to prevail on appeal, he must demonstrate that the evidence, at the time he rested, when he felt that he had fully developed his case, was such that, when viewed in the light most favorable to him, raised a factual issue as to his theory of recovery that should have been submitted to the jury. However, Guerra does not indicate in his brief what issue was raised that should have been submitted to the jury. His brief merely states that "a material issue of fact existed for jury determination." Although we are not persuaded that Guerra's brief adequately complies with the briefing rules, we, nevertheless, address his contentions as best we can, limited to any application they may have to Texas Penal Code section 32.42(b)(12). *See Fambrough v. Wagley,* 140 Tex. 577, 169 S.W.2d 478, 482 (1943).

In order to be criminally liable under section 32.42(b)(12), a person must, in the course of business, intentionally, knowingly, or with criminal negligence, make a materially false or misleading statement . . . in connection with the purchase or sale of property or service.[16] Tex. Penal Code Ann., § 32.42(b)(12) (Vernon 1994). Case law interpreting section 32.42 provides that the culpable mental state must attach to the materially false or misleading statement at the time of the purchase or sale of the property or service. *See Ely v. State,* 582 S.W.2d

416, 420 (Tex.Crim.App.1979). As we examine Guerra's brief for evidence that might constitute the conduct proscribed by the statute, we note only the following statements:

> Appellant knew that the boards were generating from a hundred thousand to a million times more errors than allowed in the specifications. Therefore, to sign off on the error rate test logs would constitute a false representation of the product being sold to the customers, thereby defrauding them.

Appellant's Br. at 5 (citations omitted).

The record reflects, and Guerra admits, that the only representation made to Datapoint customers about the product was that it did not meet specifications. We have found no evidence of other representations in the record and we have been directed to none.

It is undisputed that Guerra had no part in the marketing or distribution of the ARC-NETplus product. He was not in the marketing department, and it was undisputed that he did not have anything to do with the actual decision to ship or not to ship the system. Inasmuch as Datapoint admitted to its customers that its product was not meeting specifications when the product was sold, there could be no false or misleading statement by Datapoint. Consequently, there was no possibility that Guerra could have been exposed to criminal liability under section 32.42.

Viewed in the light most favorable to Guerra, the evidence did not raise a factual issue of criminal liability for submission to the jury. As a matter of law, Datapoint was entitled to a directed verdict upon the evidence as it existed when Guerra rested his case.

We find no error requiring reversal and the judgment of the trial court is, therefore, affirmed.

---

**16.** Section 32.42(b)(12) also proscribes making a materially false or misleading statement in an advertisement for the purchase or sale of property or service, but there is no contention that this subsection applies, nor does the evidence support such a contention. *See* Tex. Penal Code Ann. § 32.42(b)(12)(A) (Vernon 1994).